NATIONAL BANK OF COMMERCE *vs.* CITY OF NEW BEDFORD.

Bristol.   December 12, 1899. — February 27, 1900.

Present: HOLMES, C. J., MORTON, BARKER, HAMMOND, & LORING, JJ.

*Tax — Abatement — Appeal — Objection to Jurisdiction — Commissioner — Law and Fact — National Bank — Value of Shares — Evidence — Estoppel.*

It is no bar to the jurisdiction of the court that an appeal to the Superior Court, under St. 1890, c. 127, for an abatement of taxes, was entered less than thirty days after the assessors had given the appellant notice of their decision under § 2, providing that the entry shall be made " at the return day first occurring not less than thirty days after " such notice of the decision; nor that the appeal was not tried at the first trial term, as provided in § 4, if the objections are not seasonably taken.

A commissioner appointed under St. 1890, c. 127, § 5, upon an appeal to the Superior Court for an abatement of taxes assessed on shares of a national bank, is authorized to find the fair cash value of such shares, and his judgment in matters of fact is not open to revision by this court on exceptions.

An expert may testify to value, although his knowledge of details is chiefly derived from inadmissible sources, but the fact that he may use hearsay as a ground of opinion does not make the hearsay admissible.

The excess of the assets over the liabilities of a national bank at a stated time is of no importance in determining the fair cash value of its shares for the purposes of taxation, where there is sufficient evidence of a sum for which the shares could have been sold on that date.

A national bank, at the trial of a petition for the abatement of a tax assessed upon its shares, supported the report of a commissioner that the fair cash value of its

shares for the purposes of taxation was their market value as found by him. Subsequently the bank voted to petition for an abatement of the tax for 1897 upon the basis of the difference between the assessed valuation and the fair cash value of its shares based on the cash sales on or about May 1 of that year. The assessors had requested the bank to submit a statement of the price at which its shares were actually sold at the last sale prior to May 1, mentioning that the last quoted sale before that day was at a certain rate, to which the bank made no reply. *Held*, that the bank was not estopped to set up that the fair cash value of its shares for the purposes of assessment was less than the cash sales on or about May 1, 1897.

APPEAL to the Superior Court, under St. 1890, c. 127, from the decision of the assessors of the respondent city, on a petition for an abatement of taxes assessed upon the shares of the petitioner. Trial, without a jury, before *Braley*, J., who found for the petitioner; and the respondent alleged exceptions. The facts appear in the opinion.

*L. LeB. Holmes*, for the respondent.

*O. Prescott, Jr.*, for the petitioner.

HOLMES, C. J. This is an appeal to the Superior Court, under St. 1890, c. 127, for an abatement of taxes, and is here on exceptions. It was entered, we assume, in less than thirty days after the assessors had given the appellant notice of their decision under § 2, and the suggestion is made at the outset that this is fatal to the jurisdiction by the terms of that section. But, so far as we can see, if this point is open to the respondent, the provision for entry at the return day first occurring not less than thirty days after notice is only for the convenience of the city or town concerned as party to the litigation, and does not go to the jurisdiction of the court in such a sense that the court is not at liberty to proceed with the case if an early entry is allowed to be made without objection. No objection was taken in this case. The averment in the tardily filed answer that " the taking, entering, and prosecuting of this appeal was not authorized " goes to a different point, namely, the meaning of the directors' vote authorizing the petition, as to which some argument is made. We are aware of the strict rule that has been applied in some cases to an attempt to enter late when the party's rights are barred, but it does not seem to us that the same strictness should be extended to entries made too soon, when the right to enter is outstanding and a proper entry could be made if the party had notice that the letter of the law was insisted upon. *Palmer*

v. *Dayton*, 4 Cush. 270.   *Eddy's case*, 6 Cush. 28.   *Custy* v. *Lowell*, 117 Mass. 78.

The Superior Court was asked to rule that it had no jurisdiction because the appeal was not tried at the first trial term as provided in § 4.   The reason for the delay seems to have been that the respondent had not filed an answer, but it now contends that no answer was necessary and that the right of the Superior Court to try the appeal expired with its first sitting.   What happened was that after the answer was filed the court appointed a commissioner under § 5, by agreement.   We do not care to say more of the respondent's position than that the provision for early trial is for the respondent's benefit, could be waived by it, and, even more plainly than that concerning entry, does not go to the jurisdiction of the court.

Another suggestion was made that the directors' vote authorizing the petition authorized it only to the extent that the assessed valuation exceeded the fair cash value " based on the cash sales on or about " May 1, 1897.   Probably the cash sales referred to were cash sales which the petitioner offered to prove but was prevented from proving by the objection of the respondent.   If so, we cannot tell what the supposed limit would be ; but, further, we think that the vote meant to authorize application for whatever abatement the bank could get, and as the city withdrew this objection before the commissioner we are surprised that it should have been renewed here.

We pass to the questions upon the merits.   The tax rate was $16.20 per thousand dollars.   The assessors found the fair cash value of the shares of the bank to be $73.65 a share (in excess of realty), and assessed a tax of $11,931.50.   The Superior Court granted an abatement of $2,211.37 and interest.   The case had been referred to a commissioner, as we have stated, under St. 1890, c. 127, § 5, and was heard on his reports.   The abatement seems to have been reached by adopting the commissioner's finding that the fair cash value of the shares was $60 a share, subject to a possible question of law which we shall mention but which is not open now.   It is objected in the first place, we presume under the request for a general ruling that the petitioner was not entitled to an abatement, that the commissioner was not authorized to find the value of the shares, as that was the issue to

be determined, but only facts relevant to the determination of that issue by the court. We cannot agree to the objection. The fair cash value was itself a question of fact, and the fact that it was an issue did not withdraw it from the cognizance of the commissioner any more than a similar fact necessarily would withdraw a particular conclusion from the sphere of testimony. *Poole* v. *Dean*, 152 Mass. 589, 591.

On the first of May, 1897, the bank was in the midst of a local panic or depression due to recent revelations concerning some of the New Bedford mills. The last auction sale of the stock was in November, 1896, at $80 a share. This was before the depression. The next one proved was in November, 1897, at $59.50. Experts set the value on May 1 at from $45 to $55. The respondent says that their testimony should not have been admitted, or at least should not have been followed, but that the respondent should have been allowed to prove private sales, stock quotations from the files of a newspaper, and " the intrinsic value of the assets of the bank," after paying all its liabilities, and that the commissioner erred in excluding this evidence and in disregarding, as he said that he did, the returns made by the bank to the comptroller of the currency according to which the stock should have been worth $123 or $124 a share. A ruling was asked to the effect that the cash sales about May 1 were for $80, and therefore that the petitioner was not entitled to an abatement.

A portion of the argument for the respondent is addressed rather to matters of fact than to questions of law, and therefore is not pertinent to the case in its present stage. For instance, when the commissioner reports that he " disregards" the evidence of the returns he does not mean that he rules it to be inadmissible, for he ruled the other way, but he means that as a judge of facts he finds it untrustworthy and uninstructive for good reasons, which he gives. We have nothing to do with his judgment on this point. So the degree of importance to be attached to the testimony of the experts is not to be discussed here, and, generally, which elements of the admissible evidence should have the prevailing weight in fixing the value to be determined is for the judge of facts. Upon the same principle the ruling requested, even if the premise that the sales about May 1

were for $80 had been undisputed, was for a conclusion which was not matter of law. It was a question of fact not only whether the sales were proved, but also whether they afforded a fair criterion of value.

The respondent argues as if it had saved an exception to the exclusion of evidence of private sales of stock from April 24, 1897, to November 3, 1897. But it appears from the record that this evidence was offered by the petitioner and objected to by the respondent. It is enough to add that we think the commissioner probably was right in considering the evidence uninstructive under the conditions not denied to have existed on the first of May. *Eaton* v. *Mellus*, 7 Gray, 566, 579, 580. He was right also in rejecting newspapers purporting to contain stock quotations furnished by named New Bedford stockbrokers who could have been called. *Whelan* v. *Lynch*, 60 N. Y. 469, 474. *Schmidt* v. *Herfurth*, 5 Rob. (N. Y.) 124, 145. See *Silverstein* v. *O'Brien*, 165 Mass. 512 ; *Ashworth* v. *Kittridge*, 12 Cush. 193 ; *Payson* v. *Everett*, 12 Minn. 216, 219. An expert may testify to value although his knowledge of details is chiefly derived from inadmissible sources, because he gives the sanction of his general experience. But the fact that an expert may use hearsay as a ground of opinion does not make the hearsay admissible. See *Whitney* v. *Thacher*, 117 Mass. 523, 527 ; *Finnegan* v. *Fall River Gas Works Co.* 159 Mass. 311 ; *Smith* v. *North Carolina Railroad*, 68 N. C. 107, 116 ; *Central Railroad & Banking Co.* v. *Skellie*, 86 Ga. 686, 693, 694 ; *Hoxsie* v. *Empire Lumber Co.* 41 Minn. 548, 551 ; *Laurent* v. *Vaughn*, 30 Vt. 90, 94, 95 ; *Thatcher* v. *Kaucher*, 2 Col. 698. In *Fennerstein's Champagne*, 3 Wall. 145, and possibly in *Cliquot's Champagne*, 3 Wall. 114, the Supreme Court of the United States showed its willingness to go a little further than this court has gone, although not so far as to let in these newspapers. A later case is more cautious in its expressions. *Chaffee* v. *United States*, 18 Wall. 516, 542. In *Sisson* v. *Cleveland & Toledo Railroad*, 14 Mich. 489, 497, and *Peter* v. *Thickstun*, 51 Mich. 589, 593, the precise facts do not appear. If it was held that newspaper reports are admissible under some circumstances, when better evidence is not attainable, we do not need to differ from the decision in this case, as here the sources of the reports were at hand. See Whart. Ev. (3d ed.) § 674.

The exception mainly relied upon seems to be that which was taken to the exclusion of evidence that "the intrinsic value of the assets and property of the petitioner bank on May 1, 1897, was, after paying all its liabilities, in excess of an amount equivalent to eighty dollars per share of its capital stock." In view of the former decision between these same parties, 155 Mass. 313, the respondent is driven to the argument that, although such evidence would not be controlling, it is admissible. But under the circumstances of this case the argument is merely technical, — an argument for a right which could have no influence on the case. There was an ascertainable sum for which these shares could have been sold on May 1, and that being so, it was useless to prove that the public ought to have been willing to give more.

It is true that it has been held, not without hesitation, that at common law you could look behind market values to get at corrected values as shown by subsequent events, in an action for fraudulent representations where the fraud which deceived the plaintiff also may have deceived the public. *Whiting* v. *Price*, 172 Mass. 240, 242. But, generally speaking, when a statute requires the "fair cash value" of property on a certain day to be ascertained, Pub. Sts. c. 13, § 8, it refers to the actual judgment of the public as expressed in the price which some one will pay, not to what the court at a later time may think would have been a wiser opinion. It means the highest price that a normal purchaser, not under peculiar compulsion, will pay at that time to get that thing. *Bradley* v. *Hooker*, 175 Mass. 145. If the word "fair" is thought to add a little latitude to the definition and to allow a correction of whatever was the fleeting accident of a moment of panic by the consideration of values on either side of the precise time fixed by the statute, that correction has been made, by setting the value of the stock at sixty rather than at fifty dollars. The commissioner added ten dollars a share for that very purpose. But it appears to us that the excess of assets over liabilities is of no importance for that purpose, as it throws no light whatever upon the selling prices of the stock. There was sufficient evidence upon which to form an opinion of the selling price, defined as we have defined it, without the need of resorting to such indirect methods of getting

at it, and therefore the attempt to divert the inquiry into a wrong channel was met properly enough by a rejection of the evidence.

A ruling was asked and an argument is made that the bank is estopped to set up that the fair cash value of its shares for the purpose of assessment was less than the cash sales on or about May 1, 1897, and that those sales were at $80 a share. We have said or implied already that it does not appear that the sales nearest to May 1 and before that date were fair tests of value at the time, and of course it does not appear that they were fair tests of value on May 1, after the storm had struck the market. We have mentioned that the sales referred to in the vote to apply for an abatement possibly if not probably referred to sales not put in evidence. But if there had been a sale at public auction on the first of May and the vote had referred to it in terms, we still should be quite at a loss to see any element of estoppel in the conduct of the bank, whether in the vote, or in trying the case reported in 155 Mass. 313, or in not informing the assessors of sales later than April 24, or for less than $80,* and, as we do not find a shadow of a ground for one in the argument for the city, we shall not spend time in establishing a negative. *Troy Cotton & Woolen Manuf. Co.* v. *Fall River,* 167 Mass. 517, 520.

The difficulty of dealing with this case has been enhanced by the failure of the argument to follow the exceptions or to refer to them in such a way as to make clear upon what particular ruling or refusal to rule it was proceeding. But we have examined it and compared it with the bill of exceptions, and we are satisfied that no error is made out.   *Exceptions overruled.*

---

* The vote authorized the cashier to execute on behalf of the bank a petition for the abatement of the tax for 1897, "based upon the difference between the assessed valuation per share and the fair cash value thereof based on the cash sales on about the first day of May, 1897." Soon after the first of May the assessors wrote to the cashier of the bank, requesting him to submit to them a statement of the price at which shares of the bank were actually sold at the last sale prior to May 1, 1897, and mentioning that, according to a list published in a local paper on April 28, the last sale of the bank stock was at the rate of $80 per share; to which the bank made no reply.